UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC FRONTIER FOUNDATION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 14-760-RMC |
| v. | ) ) | |
| DEPARTMENT OF JUSTICE, | ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF DAVID J. SHERMAN

I, DAVID J. SHERMAN, hereby declare and state:

1.      I am the Associate Director for Policy and Records at the National Security Agency ("NSA" or "Agency"), an intelligence agency within the Department of Defense.  I have been employed with NSA since 1985.  Prior to my current assignment, I held various senior and supervisory positions at NSA and elsewhere in the Executive Branch, to include serving as the Deputy Chief of Staff in the Agency's Signals Intelligence Directorate, its representative to the Department of Defense, Deputy Associate Director for Foreign Affairs, and Director for Intelligence Programs at the National Security Council.  As the Associate Director for Policy and Records, I am responsible for, among other things, the processing of all requests made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for NSA records.

2.      In addition, I am a TOP SECRET original classification authority ("OCA") pursuant to Section 1.3 of Executive Order ("E.O.") 13526, dated 29 December 2009

(75 Fed. Reg. 707).   It is my responsibility to assert the FOIA exemptions over NSA information in the course of litigation.   Through the exercise of my official duties, I have become familiar with the current litigation arising out of FOIA requests for information filed by the Plaintiff, Electronic Frontier Foundation.

3.   Through the exercise of my official duties, I have become familiar with this civil action and the underlying FOIA requests.   I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

4.   I submit this declaration in support of the U.S. Department of Justice's ("DoJ") Motion for Summary Judgment in this proceeding.   The purpose of this declaration is to explain and justify, to the extent possible on the public record, the withholdings taken by the NSA in responding to Plaintiff's requests for information under the FOIA.   To the extent that the Court requires additional information regarding particular withholdings, the Agency will submit an *in camera, ex parte* classified declaration upon request to provide further explanation of the harm to the national security that could reasonably be expected to occur if certain information were to be released.

### ORIGIN AND MISSION OF NSA

5.       The NSA was established by Presidential Directive in October 1952 as a separately-organized agency within the Department of Defense under the direction, authority, and control of the Secretary of Defense.   NSA's foreign intelligence mission includes the responsibility to collect, process, analyze, produce, and disseminate signals intelligence ("SIGINT") information for foreign intelligence and counterintelligence purposes to support national and departmental missions and for the conduct of military operations.   *See* E.O. 12333, section 1.7(c), as amended.

6.      In performing its SIGINT mission, NSA exploits foreign electromagnetic signals to obtain intelligence information necessary to the national defense, national security, or the conduct of foreign affairs.  NSA has developed a sophisticated worldwide SIGINT collection network that acquires foreign and international electronic communications.  The technological infrastructure that supports NSA's foreign intelligence information collection network has taken years to develop at a cost of billions of dollars and significant human effort. It relies on sophisticated collection and processing technology.

## IMPORTANCE OF SIGINT TO THE NATIONAL SECURITY

7.      There are two primary reasons for gathering and analyzing intelligence information.  The first, and most important, is to gain the information required to direct U.S. resources as necessary to counter threats to the nation and its allies.  The second reason is to obtain the information necessary to direct the foreign policy of the United States.  Foreign intelligence information provided by the NSA is routinely distributed to a wide variety of senior Government officials, including the President; the President's National Security Advisor; the Director of National Intelligence; the Secretaries of Defense, State, Treasury, and Commerce; U.S. ambassadors serving in posts abroad; the Joint Chiefs of Staff; and the Unified and Specified Commanders.  In addition, SIGINT information is disseminated to numerous agencies and departments, including, among others, the Central Intelligence Agency; the Federal Bureau of Investigation; the Drug Enforcement Administration; the Departments of the Army, Navy, and Air Force; and various intelligence components of the Department of Defense.  Information provided by NSA is relevant to a wide range of important issues, including, but not limited to, military

order of battle, threat warnings and readiness, arms proliferation, terrorism, and foreign aspects of international narcotics trafficking.  This information is often critical to the formulation of U.S. foreign policy and the support of U.S. military operations around the world.  Moreover, intelligence produced by NSA is often unobtainable by other means.

## CATEGORIES OF INFORMATION WITHHELD

8.     The purpose of this declaration is to advise the Court that NSA withheld certain information, as set forth below, because it is properly exempt from disclosure under the FOIA based on Exemptions 1 and 3, 5 U.S.C. §§ 552(b)(1), (3), respectively. This is so because the information remains currently and properly classified in accordance with E.O. 13526 and protected from release by statutes, specifically Section 6 of the National Security Agency Act of 1959 (Pub. L. No. 86-36) (codified at 50 U.S.C. § 3605) ("NSA Act"), 18 U.S.C. § 798, and Section 102A(i)(1) of the National Security Act of 1947, as amended (codified at 50 U.S.C. § 3024).

9.     The information withheld can be generally grouped into four categories: (1) descriptions of the threat to national security posed by adversaries; (2) operational details of NSA SIGINT collection, such as the tools and techniques employed; (3) the identities of communications service providers that have been compelled to provide assistance to the Government by the Foreign Intelligence Surveillance Court (FISC); and (4) information concerning NSA's organization. Categories 1 through 3 were withheld under FOIA Exemption 1 and Exemption 3, while information in category 4 was withheld under Exemption 3, pursuant to the NSA Act of 1959 (50 U.S.C. § 3605).[1]

---

[1]     Per agreement of the parties, I understand that Plaintiff is only challenging the Government's withholdings in documents 1, 2a, 2c, 2d, 3a, 3b, 3c, 3d, 3e, and 3f. All references to document numbers throughout this declaration comport with the numbering convention established by Plaintiff. Moreover, I further understand that in these documents, Plaintiff is not challenging docket numbers, certification

10.     Additionally, one document (Document 1) was withheld in full under FOIA Exemption 1 and Exemption 3. The justification for this withholding will be addressed separately below.

## FOIA EXEMPTION 1

11.     Section 552(b)(1) of the FOIA provides that the FOIA does not require the release of matters that are specifically authorized under criteria established by an Executive Order to be kept secret in the interest of the national defense or foreign policy, and are in fact properly classified pursuant to such Executive Order.   The current Executive Order that establishes such criteria is E.O. 13526.

12.     Section 1.1 of E.O. 13526 provides that information may be originally classified if:  1) an original classification authority is classifying the information; 2) the information is owned by, produced by or for, or is under the control of the Government; 3) the information falls within one or more of the categories of information listed in section 1.4 of the Executive Order; and 4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the original classification authority is able to identify or describe the damage.

13.     Section 1.2(a) of E.O. 13526 provides that information shall be classified at one of three levels.  Information shall be classified at the TOP SECRET level if its unauthorized disclosure reasonably could be expected to cause exceptionally grave damage to the national security.  Information shall be classified at the SECRET level if its unauthorized disclosure reasonably could be expected to cause serious damage to the

---

numbers and quantities, application numbers, withholdings under FOIA Exemption 6, and names or descriptions of surveillance targets.

national security.   Information shall be classified at the CONFIDENTIAL level if its unauthorized disclosure reasonably could be expected to cause damage to the national security.

14.   Section 1.4 of E.O 13526 provides that information shall not be considered for classification unless it falls within one (or more) of eight specifically enumerated categories of information.   The categories of classified information in the NSA documents at issue here are those found in Section 1.4(c), which includes intelligence activities (including covert action), intelligence sources and methods, or cryptology; Section 1.4(d), which includes foreign relations or foreign activities of the United States, including confidential sources; and Section 1.4(g), which includes vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security.

15.   In my role as a TOP SECRET OCA, I reviewed the categories of information withheld pursuant to these FOIA requests and determined that those categories of information are currently and properly classified in accordance with E.O. 13526.   Based on that determination, I have determined that the responsive material at issue was properly withheld, as all of this information is owned by, produced for, or under the control of the U.S. Government and is currently and properly classified in accordance with E.O. 13526.   Accordingly, the release of this intelligence information could reasonably be expected to cause damage to the national security.   The damage to national security that reasonably could be expected to result from the unauthorized disclosure of this classified information is described below.

## FOIA EXEMPTION 3

16.     Exemption 3 provides that FOIA does not require the production of records that are:

> specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3).[2]

17.     The challenged information at issue in this litigation falls squarely within the scope of three statutes.  The first applicable statute is a statutory privilege unique to NSA.     As set forth in section 6 of the NSA Act, Public Law 86-36 (50 U.S.C. § 3605), "**[n]othing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, [or] of any information with respect to the activities thereof. . . .** " (emphasis added).  Congress, in enacting the language in this statute, decided that disclosure of any information relating to NSA activities is potentially harmful.  Federal courts have held that the protection provided by this statute is, by its very terms, absolute.  Section 6 states unequivocally that, notwithstanding any other law, including the FOIA, NSA cannot be compelled to disclose any information with respect to its activities.  To invoke this privilege, the U.S. Government must demonstrate only that the information it seeks to protect falls within the scope of Section 6.  Further, while in this case the harm would be exceptionally grave or serious, the U.S. Government is not required to demonstrate

---

[2]     The OPEN FOIA Act of 2009 was enacted on October 28, 2009, Pub. L. 111-83, 123 Stat. 2142, 2184; 5 U.S.C. § 552(b)(3)(B), after the applicable National Security Act provision was enacted, and therefore is not applicable to the analysis in this case.

specific harm to national security when invoking this statutory privilege, but only to show that the information relates to its activities.  NSA's functions and activities are therefore protected from disclosure regardless of whether the information is classified.

18.    The second statute is Section 102A(i)(l) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1), which provides that "the Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  Like the protection afforded to core NSA activities by section 6 of the NSA Act, the protection afforded to intelligence sources and methods is absolute.  Whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 3024(i)(1).

19.    Finally, the third statute is 18 U.S.C. § 798.  This statute prohibits the unauthorized disclosure of classified information: (i) concerning the communications intelligence activities of the United States, or (ii) obtained by the process of communications intelligence derived from the communications of any foreign government.  The term "communications intelligence," as defined by Section 798, means the "procedures and methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients."

20.    As described above, these statutes protect the fragile nature of the United States' intelligence sources, methods, and activities, including but not limited to, the existence and depth of signals intelligence-related successes, weaknesses, and exploitation techniques.  These statutes recognize the vulnerability of intelligence sources and methods, including countermeasures, and the significance of the loss of valuable

intelligence information to national policymakers and the United States Intelligence Community ("IC").  Given that Congress specifically prohibited the disclosure of the sources and methods used by the IC, as well as any information related to NSA's functions and activities, I have determined that the information was properly withheld under FOIA Exemption 3.

## DESCRIPTIONS OF THE THREAT POSED BY ADVERSARIES[3]

21.    NSA withheld from disclosure information relating to the threat to national security posed by the targets of the FISC orders at issue. In support of the Government's application to the FISC for authorization to undertake electronic surveillance against agents of foreign powers, the Government is statutorily obligated to provide the court with significant detail concerning proposed targets for electronic surveillance, including the threat those powers pose to the United States, tradecraft employed by the targets to evade surveillance, and detailed descriptions of the targets' organization and makeup. Information in this category was withheld from Document 3a (pages 1, 2, 6, 7, 8, 9, 10, 16, 18, 19, 20, 21, 22, 34, 35, 36, 66, 67, 72) and Document 3b (pages 2, 3, 8, 9, and 10 of the NSA Program Manager Declaration).[4]

22.    I have reviewed this information and determined that the descriptions of the threat to national security posed by targets identified in these documents are currently and properly classified at the TOP SECRET level in accordance with E.O. 13526, because the release of this information could reasonably be expected to cause

---

[3]    Although Plaintiff has agreed not to challenge the Government's withholding of the identities or descriptions of targets, I address this category of information out of an abundance of caution. I will not address the withholding of specific names or identities of targets because I understand that Plaintiff is not challenging the withholding of such information.
[4]    Please note that Document 3b contains two separate documents, for which I will identify the withholdings by page number and document title.

exceptionally grave damage to the national security. Information regarding the targets of NSA collection efforts meets the criteria for classification set for in Sections 1.4(c), 1.4(d), and 1.4(g) of E.O. 13526.

23.     Disclosure of the details regarding the threat to national security posed by the targets of the FISC orders would publicly reveal the identities of particular targets of interest to NSA, the capability of NSA and the IC to collect information about these targets, and the limits of the Government's collection efforts. Alerting our adversaries to their status as the targets of NSA collection efforts could cause those identified to take steps to circumvent collection. Such countermeasures may inhibit access to the targets' communications, thereby denying the United States access to information crucial to the national security.

24.     The identities of those targeted by NSA for collection are also protected from release by statute and are exempt from release based on FOIA Exemption 3, 5 U.S.C. § 552(b)(3). Because the descriptions of the threat to national security posed by particular targets would tend to reveal the identities of the targets themselves, this information is likewise protected from release based on FOIA Exemption 3.  Specifically, there are three Exemption 3 statutes that protect this information from public release: section 6 of the NSA Act, 50 U.S.C. § 3605, 18 U.S.C. § 798, and 50 U.S.C. § 3024(i)(1).

25.     The identities of the targets subject to the FISC orders relate to a "function of the National Security Agency," 50 U.S.C. § 3605. Indeed, such information relates to one of NSA's primary functions, its SIGINT mission. Because any disclosure of information regarding the threats posed by particular adversaries would reveal NSA's interest in these targets and our ability to collect information about them, it follows that

the threat descriptions, if revealed, would disclose "information with respect to [NSA's] activities" in furtherance of its SIGINT mission. 50 U.S.C. § 3605.

26.     Additionally, this information is protected from release under 18 U.S.C. § 798, which protects from disclosure information concerning the communications intelligence activities of the United States, or information obtained by communications intelligence processes. Disclosure of the Government's threat assessments of these targets would reveal information relating to the targets of the Government's communication intelligence activities and information that NSA has intercepted from the communications of its foreign intelligence targets, thereby falling within the scope of protection offered by this statute. Finally, this information is protected from public release pursuant to Section 102A(i)(1) of the National Security Act, as amended, 50 U.S.C. § 3024(i)(1), which states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." Disclosure of the information withheld here could reveal the sources or methods used to collect intelligence pertaining to these threats. Therefore, it falls squarely within the protection of this statute.

## OPERATIONAL DETAILS OF NSA SIGINT COLLECTION

27.     NSA withheld from disclosure information concerning the technical means by which NSA conducts its SIGINT mission and other operational details. This information includes the techniques and tools employed to collect communications of foreign intelligence targets, the types of communications and facilities targeted, the procedures by which particular communications are targeted, analytic tools and methodologies applied to collected data, the identification of countermeasures used by

foreign powers, methods by which NSA determines the foreignness of selectors, the scope and limitations of NSA's collection capabilities, and NSA's foreign partners. Information in this category was withheld from Document 2a (pages 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 28, 31, 35, 36, and 39); Document 2c (pages 1 and 2); Document 2d (pages 1, 2, 3, 5, 6, 7, and 8); Document 3a (pages 1, 2, 3, 10, 11, 12, 13, 24, 25, 26, 27, 31, 32, 34, 35, 36, 37, 38, 39, 44, 45, 48, and 49); Document 3b (pages 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 26, and 27 of the Supplemental Memorandum of Law and pages 2, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 of the NSA Program Manager Declaration); Document 3c (pages 7, 8, and 11); Document 3d (pages 5, 6, 7, 8, 9, 10, 12, 13, and 16); Document 3e (pages 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 19, 20, and 21); and Document 3f (pages 5, 6, 7, 8, 9, 10, 12, 13, 15, and 16).

28.     I have reviewed this information and determined that such operational details are currently and properly classified at the TOP SECRET level in accordance with E.O. 13526, because the release of this information could reasonably be expected to cause exceptionally grave damage to the national security. Information regarding the technical means by which NSA effects SIGINT collection, the scope and limitations of that collection, and the analytic tools and methodologies that NSA applies to that collection meets the criteria for classification set forth in Sections 1.4(c), 1.4 (d), and 1.4(g) of E.O. 13526.

29.     Disclosure of the technical details by which NSA effects SIGINT collection and the scope of that collection would demonstrate the capabilities and limitations of the U.S. SIGINT system, and the success (or lack of success) in acquiring

certain types of communications. The collection of communications intelligence is central to NSA's mission and allows NSA to provide unique and timely insight into the activities of foreign adversaries for U.S. policymakers. Public disclosure of NSA's capabilities to acquire specific types of communications, the technical means and methods by which such acquisitions are effected, and the analytical tools applied to such acquisitions would alert targets to the vulnerabilities of their communications (and conversely, which of their communications are not vulnerable). Such a disclosure would also alert adversaries to the Government's awareness of specific tradecraft used to protect the adversaries' communications and the methods by which such tradecraft is defeated. Once alerted, adversaries could develop additional countermeasures to thwart collection of electronic communications. Such a reaction may result in denial of access to targets' communications and therefore result in a loss of information critical to the national security and defense of the United States.

30.     Additionally, any release of additional operational details about these collection efforts would reveal NSA's uses of specific sources and methods that could assist adversaries in undermining NSA's national security mission. Foreign intelligence targets know how they communicate, so disclosure of information such as the particular sources from which NSA collects information, the types of data collected, or the analytic methodologies applied to that data, would permit foreign adversaries to more effectively craft their communications security efforts to frustrate the Government's collection of information crucial to the national security.

31.     Similarly, disclosure of details regarding the types of facilities that NSA targeted under specific programs would reveal NSA's methodology for identifying

specific facilities for collection, from which an adversary could extrapolate NSA's analytic process for identifying worldwide facilities for SIGINT collection. Adversaries could apply this insight to determine which forms of communications used may be subject to SIGINT collection. Additionally, disclosure of the specific facilities from which communications were collected under particular authorities would alert the targets to which communications NSA did and did not collect, as well as reveal the nature and scope of particular NSA programs. Disclosure of this information would allow targets to discern which of their communications may have been collected, as well as gaps in collection that could reveal that particular communications were "safe."

32.    Finally, disclosure of the methods by which NSA determines the foreignness of selectors and the procedures by which particular communications are targeted would reveal information from which targets could derive countermeasures to evade NSA surveillance by masquerading as persons whose communications either explicitly are not or may not be authorized for collection. Appropriately targeting communications remains a primary requirement under authorities such as Section 702 of the FISA Amendments Act. As a result, revealing the precise methods and procedures by which NSA determines that it is authorized to target particular communications could encourage adversaries to adopt countermeasures that would make it more difficult for NSA to determine accurately the foreignness of their communications, thereby hindering the Government's collection of information crucial to the national security of the United States.

33.    This information is also protected from release by statute and is exempt from release based on FOIA Exemption 3, 5 U.S.C. § 552(b)(3). Specifically, there are

three Exemption 3 statutes that protect from public release the operational details of NSA's SIGINT collection: section 6 of the NSA Act, 50 U.S.C. § 3605, 18 U.S.C. § 798, and Section 102A(i)(1) of the National Security Act, as amended, 50 U.S.C. § 3024(i)(1).

34.    The operational details described above relate to a "function of the National Security Agency," 50 U.S.C. § 3605. Indeed, this information relates to one of NSA's primary functions, its SIGINT mission. Any disclosure of the withheld operational details would reveal NSA's capabilities and the tradecraft used to carry out this vital mission.  Further, revealing these details would disclose "information with respect to [NSA's] activities" in furtherance of its SIGINT mission. 50 U.S.C. § 3605.

35.    Moreover, this information is protected from public release pursuant to Section 102A(i)(1) of the National Security Act, as amended, 50 U.S.C. § 3024(i)(1), which states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." The withheld operational details, such as the technical means of collection and analytic methodology, constitute the sources and methods used by NSA to carry out its SIGINT mission. Therefore, this information falls squarely within the protection of Section 102A(i)(1) of the National Security Act and should be afforded absolute protection from release.

36.    Finally, the information is protected from release under 18 U.S.C. § 798, which protects from disclosure information concerning the communications intelligence activities of the United States, or information obtained by communications intelligence processes. Disclosure of the withheld operational details would reveal key information about the means through which NSA collects and processes communications intelligence, thereby falling within the scope of protection offered by this statute.

## IDENTITIES OF COMMUNICATIONS SERVICE PROVIDERS

37.     NSA has also withheld all identities of communications service providers subject to the FISC orders at issue, along with information that would reveal the number of providers subject to such orders. Information in this category was withheld from Document 3a (pages 32 and 36); Document 3b (page 18 of the Supplemental Memorandum of Law); Document 3c (pages 8 and 9); Document 3d (pages 6, 7, 10, and 11); Document 3e (page 4); and Document 3f (pages 6, 7, 10, and 11).

38.     Releasing the identity of any communications service provider subject to the FISC orders at issue or the number of such providers would disclose currently and properly classified intelligence information. Disclosing even the number of providers subject to FISC orders at a particular period of time could allow an adversary to use other information, such as providers' market share, to extrapolate the identities of those communications service providers.  Confirming or denying a relationship between NSA and any communications service provider with respect to a specific intelligence activity is reasonably likely to cause exceptionally grave damage to the national security. Foreign intelligence targets know how they communicate, and therefore, would know, upon a disclosure of NSA's capabilities via the release of the identity of any particular communications service provider, which of their electronic communications were potentially vulnerable to collection, querying, and analysis (and, conversely, which of their communications may not have been vulnerable). Once alerted, targets could potentially frustrate NSA collection by simply switching to a provider that has not been identified, something which can be done easily and quickly. This shift may result in

denial of access to targets' communications and therefore result in a loss of access to information crucial to the national security and defense of the United States.

39.     Furthermore, foreign intelligence targets are known to analyze public disclosures of NSA's capabilities.  Confirmation that specific providers participated in a particular program would alert targets to which of their communications NSA did and did not collect, as well as the nature and scope of NSA's collection efforts.  The public disclosure that NSA possessed a specific capability over a specific period of time to acquire records from certain providers would easily alert targets to the vulnerability of their communications during that time period.  Disclosure of this information would allow targets to know what information was collected at particular times, as well as identify gaps in coverage that would reveal that information from a particular period had likely evaded collection.

40.     Disclosure of this information could reasonably be expected to cause exceptionally grave damage to the national security for the reasons described above. I have reviewed this information and determined that it is currently and properly classified as TOP SECRET and falls within Sections 1.4(c), 1.4(d), and 1.4(g) of E.O. 13526.

41.     This information is also protected from release by statute and is exempt from release based on FOIA Exemption 3, 5 U.S.C. § 552(b)(3). Specifically, there are three Exemption 3 statutes that protect from public release the identities and number of providers: section 6 of the NSA Act, 50 U.S.C. § 3605, 18 U.S.C. § 798, and Section 102A(i)(1) of the National Security Act, as amended, 50 U.S.C. § 3024(i)(1).

42.     The identities of the providers and the number of providers relate to a "function of the National Security Agency," 50 U.S.C. § 3605. Indeed, this information

relates to one of NSA's primary functions, its SIGINT mission. Any disclosure of the identities of the providers or the number of providers would reveal NSA's capabilities and the tradecraft used to carry out this vital mission.  Further, revealing the providers' identities and the number of providers would disclose "information with respect to [NSA's] activities" in furtherance of its SIGINT mission. 50 U.S.C. § 3605.

43.     Moreover, this information is protected from public release pursuant to Section 102A(i)(1) of the National Security Act, as amended, 50 U.S.C. § 3024(i)(1), which states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." The specified communications service providers are intelligence sources for communications intelligence. Therefore, information identifying the providers, or revealing the number of providers, falls squarely within the protection of Section 102A(i)(1) of the National Security Act and should be afforded absolute protection from release.

44.     Finally, this information is protected from release under 18 U.S.C. § 798, which protects from disclosure information concerning the communications intelligence activities of the United States, or information obtained by communications intelligence processes. Disclosure of the identities of the providers or the number of providers would reveal key information about the methods by which NSA intercepts the communications of its foreign intelligence targets, thereby falling within the scope of protection offered by this statute.

## INFORMATION CONCERNING NSA'S ORGANIZATION

45.     The NSA withheld from disclosure information about the internal organization of NSA, including names of the offices involved in these programs.

Information in this category was withheld from Document 3a (pages 5 and 50); Document 3d (page 13); and Document 3f (page 13). This information is protected from release by statute and is exempt from release based on FOIA Exemption 3, 5 U.S.C. § 552(b)(3). Specifically, section 6 of the NSA Act, 50 U.S.C. § 3605, protects from disclosure "the organization or any function of the National Security Agency." 50 U.S.C. § 3605.

## WITHHOLDING IN FULL OF DOCUMENT 1

46.     NSA withheld in full one document, a FISC opinion cited in footnote 15 of Judge Bates' October 3, 2011 opinion. The citation to that FISC opinion was redacted in full.  Footnote 15, as released, states:

> The government's revelations regarding the scope of NSA's upstream collection implicate 50 U.S.C. § 1809(a), which makes it a crime (1) to "engage[] in electronic surveillance under color of law except as authorized" by statute or (2) to "disclose[] or use[] information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized" by statute.  <u>See</u> [REDACTED] (concluding that Section 1809(a)(2) precluded the Court from approving the government's proposed use of, among other things, certain data acquired by NSA without statutory authority through its "upstream collection").  The Court will address Section 1809(a) and related issues in a separate order.

47.     The release of the redacted information would disclose information that remains currently and properly classified.   Specifically, the release of the redacted information would disclose sensitive operational details associated with NSA's "Upstream" collection capability.   While certain information regarding NSA's "Upstream" collection capability has been declassified and publicly disclosed, certain other information regarding the capability remains currently and properly classified.  The redacted information would reveal specific details regarding the application and

implementation of the "Upstream" collection capability that have not been publicly disclosed. Revealing the specific means and methodology by which certain types of SIGINT collections are accomplished could allow adversaries to develop countermeasures to frustrate NSA's collection of information crucial to the national security. Disclosure of this information could reasonably be expected to cause exceptionally grave damage to the national security. I have reviewed this information and determined that it is currently and properly classified as TOP SECRET and falls within Sections 1.4(c), 1.4(d), and 1.4(g) of E.O. 13526.

48.     Moreover, this information is protected from release under FOIA Exemption 3. Such technical information describes a core function and activity of NSA—the SIGINT mission. As a result, the information would also be protected from release by Section 6 of the NSA Act, 50 U.S.C. § 3605. Additionally, this information is protected from public release pursuant to Section 102A(i)(1) of the National Security Act, as amended, 50 U.S.C. § 3024(i)(1), which states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." The technical information withheld here describes the methods by which NSA accomplishes its SIGINT mission, and therefore falls squarely within the protection of this statute. Finally, this information is protected from release under 18 U.S.C. § 798, which protects from disclosure information concerning the communications intelligence activities of the United States, or information obtained by communications intelligence processes. This information pertains to the technical methods by which NSA collects certain types of communications intelligence. Therefore, it would also be protected from release by 18 U.S.C. § 798.

49.     I have determined that the release of this information could reasonably be expected to cause exceptionally grave damage to the national security because its release could allow our adversaries to undertake countermeasures that would degrade the effectiveness of NSA's collection using this intelligence method.  Such countermeasures cannot be discussed in a public declaration without revealing the very information that the NSA is protecting from release pursuant to FOIA Exemptions 1 and 3, namely, this intelligence method.  If the effectiveness of the intelligence method has been degraded, NSA would no longer be able to rely on this method, and NSA's ability to collect these communications would then be compromised.  A lost or reduced ability to collect communications of targets, particularly those associated with known and suspected terrorist operatives, would greatly impact the effectiveness of NSA's SIGINT mission, including its support to the Government's counterterrorism efforts.

## SEGREGABILITY

50.     All of these documents have been reviewed for purposes of complying with FOIA's segregability provision, which requires the Government to release "any reasonably segregable portion of a record" after proper application of the FOIA exemptions. 5 U.S.C. § 552(b). Multiple agencies performed an intensive, line-by-line review of each document, redactions were surgically applied to protect information exempted from release under the FOIA, and all reasonably segregable, non-exempt information has been released.

51.     Further, in accordance with E.O. 13526, § 1.7(e), with respect to all of the redactions taken, it is my judgment that any information in those documents that, viewed in isolation, could be considered unclassified, is nonetheless classified in the context of

this case because it can reasonably be expected to reveal (directly or by implication) classified national security information concerning the timing or nature of intelligence activities, sources, and methods when combined with other information that might be available to the public or adversaries of the United States. In these circumstances, the disclosure of even seemingly mundane portions of these documents, when considered in conjunction with other publicly available information, could reasonably be expected to assist a sophisticated adversary in deducing particular intelligence activities or sources and methods, and possibly lead to the use of countermeasures that may deprive the United States of critical intelligence.

52.     With respect to the FISC opinion withheld in full, it is my judgment that any information in that document is classified in the context of this case because it can reasonably be expected to reveal classified national security information concerning particular intelligence methods, given the nature of the document and the information that has already been released. The withheld opinion was cited in footnote 15 of the 2011 FISC opinion authored by Judge Bates. The 2011 opinion by Judge Bates was released in August 2013. Plaintiff requested the release of the FISC opinions cited in this footnote. In these circumstances, the disclosure of even seemingly mundane portions of this FISC opinion would reveal particular instances in which the "Upstream" collection program was used and could reasonably be expected to encourage sophisticated adversaries to adopt countermeasures that may deprive the United States of critical intelligence.

## **CONCLUSION**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this  30th  day of April, 2015, pursuant to 28 U.S.C. § 1746.

Dr. David J. Sherman
Associate Director for Policy and Records,
National Security Agency

23